UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

THOMAS POWERS,
          Plaintiff,

       v.                                           02-1372

LARRY DEATHERAGE, et al.,
          Defendants.

MEMORANDUM OPINION AND ORDER

      Before the court are the Defendants, DR. ARTHUR FUNK and DR. SALEH OBAISI's summary judgment motion [215], Plaintiff's response [226] and Defendants' reply [227].

Standard

      Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

      "Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

      Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy,

speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

## Background

The Plaintiff, a state prisoner, filed a complaint pursuant to 42 U.S.C. §1983, alleging that the Defendants violated his rights under the Eighth Amendment to the United States Constitution.  In Count I, the Plaintiff claims that his Eighth Amendment rights were violated because he has bone degeneration and arthritis in his hip yet the defendants refused to allow him a walking cane or a lower berth in a bunk bed. This is the only count remaining against Dr. Funk and Dr. Obaisi. Case Management Order dated January 10, 2008 (doc. # 205). The Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343.

## Undisputed Material Facts[1]

1.      The Plaintiff's claims against Dr. Funk and Dr. Obaisi concern the years 2001 through 2003. Deposition at 69, line 11-21.
2.      On May 3, 2001, the Plaintiff had a medical history taken at Joliet Correctional Center. Among other things, the Plaintiff reported that he had no mobility limitations and that he used no assistive devices. Funk Affidavit at 16; Reception & Periodic Medical History, dated May 3, 2001.
3.      The Intrasystem Transfer Form that accompanied the Plaintiff from the Winnebago County Jail (WCJ) made no mention of any significant medical history concerning the Plaintiff's hip either. Funk Affidavit, ¶17; Intrasystem Transfer Form, dated May 3, 2001.
4.      The Plaintiff transferred to Pontiac Correctional Center on May 24, 2001. No significant medical history concerning the Plaintiff's hip was reported in the health status sheet accompanying him from Joliet Correctional Center. Furthermore, the only medical issues complained of by the Plaintiff upon his arrival at the Pontiac Correctional Center concerned urinary retention and a nasal problem. Funk Affidavit, ¶18; Health Status dated May 22, 2001, and Transfer Reception Screening, dated May 24, 2001.
5.      On May 30, 2001, the Plaintiff was seen by Dr. Bulatovic at Pontiac Correctional Center for complaints of left hip pain for more than three to four months, localized right shoulder pain, and localized lower back pain (LBP).  The Plaintiff also complained of difficulty urinating and Dr. Bulatovic noted that the Plaintiff was taking Hytrin for his prostate. Funk Affidavit, ¶19; Medical progress notes dated May 30, 2001.
6.      The Plaintiff had a blood pressure of 130/80, a temperature of 98.4°F, a pulse of 68 beats per minute, and respirations of 18 breaths per minute. The Plaintiff was alert and oriented to person, place, and time (AAOx3). He reported no known drug allergies (NKDA), no peptic ulcer disease (PUD), and no melena (black tarry feces due to the interaction of

---

[1]The plaintiff disputes many facts, but his disputes are arguments and not supported by evidentiary documents.

2

intestinal secretions with blood). Funk Affidavit, ¶20; Medical progress notes dated May 30, 2001.

7.  Dr. Bulatovic observed that the mechanical axis deviation of the Plaintiff's lower limbs (MAD) - gait were within normal limits (WNL). The Plaintiff's left hip joint was intact and he had a full range of motion (ROM). No spinal or muscle tenderness was observed to the back, and the Plaintiff bent over and touched his toes. His right shoulder was observed to be intact with a full range of motion (ROM). In Dr. Bulatovic's assessment (A), the Plaintiff had a lower back pain (LBP), right shoulder pain, left hip pain, and dysuria (difficult urination). Dr. Bulatovic educated (ED) the Plaintiff on range of motion (ROM) exercises and provided him with 21 Motrin, 600 mg, to be taken by mouth (PO) three times (TID) a day, and he prescribed Hytrin for the dysuria. He also directed for a follow-up (f/u) in sick call (s/c) in two weeks. Funk Affidavit, ¶21; Medical progress notes dated May 30, 2001.

8.  The following day, on May 31, 2001, medical director Arthur Funk, M.D. reviewed the chart and noted that the Plaintiff had a history of dysuria (difficulty urinating). Dr. Funk ordered an x-ray of the Plaintiff's left hip; a prostrate specific antigen test (PSA, used to screen for prostate cancer); a complete blood count (CBC, i.e., a panel of tests including a white blood cell count, white blood cell differential, red blood cell count, hemoglobin, hematocrit, platelet count, mean corpuscular volume, mean corpuscular hemoglobin, mean corpuscular hemoglobin concentration, and red cell distribution width); comprehensive metabolic panel (CMP, i.e., a group of 14 specific tests, including glucose, calcium, sodium, potassium, CO2 {carbon dioxide, bicarbonate}, chloride, BUN (blood urea nitrogen), creatinine, albumin, total protein, alkaline phosphatase, alanine aminotransferase, aspartate aminotransferase, and bilirubin), and a microscopic urinalysis (U/A). Funk Affidavit, ¶22; Medical progress notes dated May 31, 2001.

9.  On June 4, 2001, the Plaintiff's left hip was x-rayed. The Plaintiff's left hip was x-rayed front to back (anteroposterior or AP) and from the side with the leg bent so that it resembles that of a frog (frog leg lateral). At the request of Dr. Funk, the radiologist Nicholas Skezas, M.D., of Springfield, Illinois, reviewed the x-rays and prepared a report of his findings. The radiologist found no evidence of fracture or dislocation. He reported deterioration (degenerative changes), including mild joint space narrowing and large osteophyte (bony outgrowth) formation, especially at the lower-middle (infereomedial) margin of the bone in the thigh's (femoral) head. From the x-rays, the radiologist was not otherwise made aware of (appreciated) any other bony or other abnormalities of the muscle, fat, and skin (soft tissue) pertaining to the evaluation (focal). It was the radiologist's impression that the Plaintiff had degenerative joint disease. Funk Affidavit, ¶23; Radiological report dated June 7, 2001.

10. Degenerative joint disease, also known as osteoarthrosis, arthritis, or osteoarthritis, is mainly related to aging and generally results in the cushioning between the bone joints wearing away resulting in pain and stiffness. Funk Affidavit, ¶24.

11. On June 13, 2001, the Plaintiff was seen by Dr. Ngu for a follow-up (f/u) visit as prescheduled. The Plaintiff complained of persistent left hip pain, but reported no recent trauma. In the objective (o) portion of his note, Dr. Ngu observed that the Plaintiff (PT or patient) appeared to be in no distress. He also observed that the Plaintiff had recently

had an x-ray taken which revealed that he had degenerative joint disease (DJD).  In Dr. Ngu's assessment (a), the Plaintiff had stable degenerative joint disease in his left hip.  In the plans portion of his note, Dr. Ngu prescribed Motrin, 600 mg, to be taken by mouth (PO) three times a day (TID) as needed (PRN) with food. Dr. Ngu also prescribed range of motion (ROM) exercises and instructed the Plaintiff to follow up (f/u) as needed (PRN). Funk Affidavit, ¶25; medical progress notes dated June 13, 2001.

12.  On June 22, 2001, the Plaintiff was seen by a correctional medical technician (CMT).  In the subjective (s) portion of his note, the correctional medical technician wrote that the Plaintiff stated he needed his skin and lungs tested and that he was still in pain with his hip.  In the objective (o) portion of his note, the correctional medical technician wrote that the Plaintiff complained of a bad work environment and hip pain.  In the plan (p) portion of his note, the correctional medical technician wrote that he would refer the Plaintiff to sick call (S/C) for evaluation. Funk Affidavit, ¶26; Medical progress notes dated June 22, 2001.

13.  On June 27, 2001, however, when the Plaintiff appeared for sick call to be seen by the medical doctor, the Plaintiff (PT or patient) refused to sign the P96 (money voucher form for the $2.00 co-pay) and left the room.  This was witnessed by correctional medical technician (CMT) Cox. Funk Affidavit, ¶27; Medical progress notes dated June 27, 2001.

14.  On July 13, 2001, the Plaintiff was seen by a registered nurse (R.N.) and given a Hepatitis B injection. Funk Affidavit, ¶28; Medical progress notes dated July 13, 2001.

15.  On July 19, 2001, psychiatrist Andrew Kowalkowski, M.D., noted that the Plaintiff had failed to show for his appointment.  Dr. Kowalkowski continued the Plaintiff's prescription for mental-health medication, and wrote that the Plaintiff was to return to the clinic (RTC) the next month. Funk Affidavit, ¶29; Medical progress notes dated July 19, 2001.

16.  On August 6, 2001, Dr. Funk, the Medical Director, noted that the chart had been reviewed prior to Plaintiff's transfer and there were no pending procedures.  Funk Affidavit, ¶30; Medical progress notes dated August 6, 2001.

17.  On August 7, 2001, Registered Nurse (RN) Judy Ellinger completed the health status form for an Illinois Department of Corrections transferring facility.  She noted that the Plaintiff was taking no medications, except for those related to his mental health.  Funk Affidavit, ¶31; Health status form dated August 7, 2001.

18.  While the Plaintiff was at Pontiac, Dr. Funk had an x-ray taken, and made determinations as to what treatment he thought was warranted. Deposition at 35, lines 5-9.

19.  The Plaintiff has been doing stretching exercises most of his life and has done them continuously since his incarceration.  Deposition at 41, lines 4-10.

20.  While he was at Pontiac Correctional Center in 2001, he worked as a porter, which required him to walk, carry, and lift.  Deposition at 39, lines 11-16.

21.  The Plaintiff also performed stretching exercises. Deposition at 39, lines 17- 20.

22.  The Plaintiff has been doing stretching exercises most of his life and has done them continuously since his incarceration.  Deposition at 41, lines 4-10.

23.  The Plaintiff, a second degree black belt, is familiar with lots of different stretching exercises from his training as a martial artist.  Deposition at 42, line 7-18.

4

24.   The Plaintiff does the types of stretching exercises that have been recommended by the doctor. Deposition of 42, lines 19-22.

25.   Since 2001, the Plaintiff has been doing at least three different stretching exercises for his hip and leg. Deposition at 42, line 19, through 44, line 20.

26.   The Plaintiff does not recall ever asking Dr. Funk for a cane. Deposition at 83, lines 11-12.

27.   The Plaintiff did ask Dr. Funk for low berth, but Dr. Funk determined that it was not warranted. Deposition at 83, lines 17-20; Funk Affidavit, ¶32.

28.   In Dr. Funk's opinion as a medical doctor, based upon both the subjective and objective information gathered by medical staff concerning the underlying medical condition of Plaintiff's left hip, Plaintiff had no medical need for either a low bunk or a cane while he was at Pontiac Correctional Center. Funk Affidavit, ¶32.

29.   Instead, the Plaintiff was instructed on free range of motion exercises and given Motrin for his hip.  Deposition at 84, lines 17-21; Funk Affidavit, ¶33.

30.   All of the Plaintiff's allegations against Dr. Funk concern when the Plaintiff was at Pontiac Correctional Center.  Deposition at 35, lines 17-20.

31.   The Plaintiff was at Pontiac Correctional Center from May of 2001 to August of 2001. Transcript of Plaintiff's deposition (Deposition) at 14, lines 17-18.

32.   After Pontiac, Plaintiff was at Centralia Correctional Center, then Dixon Correctional Center, and later Hill Correctional Center.  Deposition at 49, line 7-9.

33.   Upon his reception at the Centralia Correctional Center, on August 12, 2001, the Plaintiff was screened by medical personnel.  The Plaintiff reported no current complaints, he was taking no medication other than those related to his mental health, his physical appearance was good, he self-reported arthritis, and he was observed to be in no distress. Funk Affidavit, ¶34; Transfer reception screening form dated August 12, 2001.

34.   On May 2, 2002, at the request of Dr. Kayira of Centralia Correctional Center, radiologist, Jack Lyons, M.D., reassessed the Plaintiff's hip condition. Dr. Lyons reviewed two x-rays of the Plaintiff's left hip joint taken on April 30, 2002 and compared them to x-rays taken on June 4, 2001.  Dr. Lyons found mild stable degenerative changes in the left hip joint.  Funk Affidavit, ¶35; Radiological report dated May 2, 2002.

35.   By the time the Plaintiff arrived at Dixon, his symptoms had actually improved by the stretching exercises and by some type of lubrication done by walking.  Deposition at 36, lines 19-23.

36.   While at Dixon Correctional Center the Plaintiff was seen and evaluated by Dr. Tulyasathien.  Deposition at 35, lines 21-24.

37.   Dr. Tulyasathien is an orthopedic surgeon that was brought in to evaluate the Plaintiff. Deposition at 32, line 24, through 33, line 3.

38.   In his report of consultation dated July 24, 2002, Dr. Tulyasathien wrote that he saw the Plaintiff on July 17, 2002, and the Plaintiff was complaining of pain in his left hip as well as his left low back.  The Plaintiff stated that, in approximately early 2001, he was in the Winnebago County Jail when he "entangled with a policeman" and fell sustaining pain in his low back and left hip.  The Plaintiff stated that he was treated at the Swedish American Hospital in Rockford, Illinois by a chiropractor.  The Plaintiff stated that he was later transferred to Pontiac Correctional Center, where the pain in his left hip became

worse with sharp pain that caused him to limp when walking. The Plaintiff stated that he had been walking with a limp and pain in his left hip and that, due to walking with a limp, he has started having pain in his low back. After his arrival at Dixon Correctional Center, he was referred to the orthopedic clinic. The Plaintiff told Dr. Tulyasathien that he did not recall any actual incident of injury to his hip to increase the pain. Funk Affidavit, ¶37; Request for Consultation-Report of Consultation on July 17, 2002, signed on July 24, 2002.

39. Dr. Tulyasathien's examination of the Plaintiff on July 17, 2002, showed that the Plaintiff was walking with a "cathalegic gait" [sic] ("pathologic gait" or abnormal walking pattern) on the left with limping. Examination of the Plaintiff's back showed no spasm of the paravertebral muscle (muscles near the vertebrae) at the cervical (neck), dorsal (back), and lumbar (low-back) regions. There was no tenderness on percussion (use of the fingertips to tap the body lightly but sharply) along the cervical (neck), dorsal (back), and lumbar (lowback) spines. There was good flexion/extension, lateral (pertaining to the side) flexion/rotation of the cervical (neck) and lumbar (low-back) spines. There was also no pain on flexion/extension, lateral flexion/rotation of the cervical and lumbar spines. There was no swelling or tenderness on palpation (examination with the hands or fingers) of the left hip. There was, however, marked internal rotation of the left hip with the left hip going into external rotation on flexion associated with pain. There was good active motion of both knees, ankles, and toes. The Plaintiff's quadriceps (large four-headed muscle on the thigh) strength appeared to be good. He also had good strength in the muscles around both hips. Funk Affidavit, ¶38; Request for Consultation-Report of Consultation on July 17, 2002, signed on July 24, 2002.

40. At the request of Dr. Tulyasathien (Tuly) radiologist Nichola Chiaradonna, M.D., evaluated the x-rays of the Plaintiff's left hip and pelvis that were performed on July 17, 2002. In a radiological report prepared July 22, 2002, Dr. Chiaradonna wrote that view of the pelvis passing from front to rear (AP or anteroposterior view) demonstrated no osseous lesions (pathologically altered bone) about the innominate bone, the ischial tuberosities, or superior and inferior pubic ramus (bones of the hip and pelvis). The right hip and right acetabulum were unremarkable. Views of the left hip demonstrated osteoarthritic changes with narrowing of the superior and lateral aspect of the left acetabular (rounded cavity on the exterior of the pelvis into which the head of the thigh bone fits) joint space. Dr. Chiaradonna suspected that there might be early changes of developing subchondral (below or under a cartilage) geodes (dilated lymph spaces) about the actabular component of the left hip. No other osseous lesions (pathologically altered bone) or evidence for intratrochanteric bursal calcification (calcification of the fluid filled sac which acts to reduce friction in the bony processes below the neck of the thigh bone) were observed. It was Dr. Chiaradonna's impression that the Plaintiff was developing moderate osteoarthritic changes (i.e., changes due to chronic disease involving the joint, which is characterized by destruction of the articular cartilage, overgrowth of the bone, and impaired function) of the left acetabular (rounded cavity on the exterior of the pelvis into which the head of the thigh bone fits) joint space with probable early subchondral geodes (dilated lymph spaces under the cartilage) noted. There was no evidence of avascular necrosis (death of tissue or bone due to a lack of blood supply) at the time of

6

Dr. Chiaradonna's evaluation, and no other changes were noted.  Funk Affidavit, ¶39; Radiological report of x-rays performed July 17, 2002, and written July 22, 2002.

41. In his report, Dr. Tulyasathien wrote that a review of the x-rays of the pelvis and left hip ordered and taken on July 17, 2002, showed osteophytes (bony outgrowths) involving the femoral head (top of the bone in the thigh) along with cystic change (change pertaining to a sac or pouch containing fluid, semi-fluid, or solid material) involving the femoral head (head of the femur or thigh bone) and acetabulum (rounded cavity on the exterior of the pelvis into which the head of the thigh bone fits).  Dr. Tulyasathien's impression was that the Plaintiff had osteophytes (bony outgrowths) of the left hip.  Funk Affidavit, ¶40; Request for Consultation-Report of Consultation on July 17, 2002, signed on July 24, 2002.

42. Dr. Tulyasathien treated the Plaintiff by putting him on Motrin 600 mg by mouth (PO) three times a day (TID) after meals (PC) for one week.  Dr. Tulyasathien also recommended to the Plaintiff that he use a cane in his right hand for walking.  Dr. Tulyasathien explained in his report that, since the arthritic condition of the Plaintiff's left hip would tend to get worse with time, he advised the Plaintiff to do free range of motion exercise of the left hip and to use a cane for walking.  Dr. Tulyasathien explained that this might give the Plaintiff some symptomatic relief for a long period of time prior to knee surgical management.  The Plaintiff was to follow-up with Dr. Mesrobian.  Funk Affidavit, ¶41; Request for Consultation-Report of Consultation on July 17, 2002, signed on July 24, 2002.

43. The treatment prescribed by Dr. Tulyasathien in his report does not include a low bunk permit.  Funk Affidavit, ¶42; Request for Consultation-Report of Consultation on July 17, 2002, signed on July 24, 2002.

44. It is undisputed that Dr. Tulyasathien did, however, recommend a cane.  Deposition at 35, line 21, through 36, line 6.

45. Dr. Tulyasathien's recommendation was based upon an x-ray, his physical examination of the Plaintiff, and subjective information provided by the Plaintiff.  Deposition at 33, line 11, through 34, line 10.

46. While at Dixon Correctional Center, a cane was issued to the Plaintiff on July17, 2002, and he was given a pass to have it for one year. Funk Affidavit, ¶45; Medical progress notes dated July 17, 2002.

47. Dr. Obaisi worked in Galesburg at Hill Correctional Center. Deposition at 49, lines 4-6.

48. Plaintiff's claim against Dr. Obaisi does not concern a low bunk.  Deposition at 81, lines 14-16.

49. On August 25, 2002, a nurse at the Hill Correctional Center reviewed a sick call request slip from the Plaintiff dated August 22, 2002.  In his sick call request, the Plaintiff complained of back pain.  He also wrote that he had arthritis/bone generation in his hip. He wrote that he had been given a four prong cane, that was taken from him.  In the subject (s) portion of her note, the nurse wrote that the Plaintiff stated as follows: "I need a cane, I had one before due to my left hip." In the objective (o) portion of her note, the nurse wrote that the Plaintiff had been on the yard playing basketball without a shirt, sweating, and that he walked well, ran and jumped. In the assessment (a) portion of her note, the nurse wrote that the Plaintiff was requesting a cane.  In the plan (p) portion of

her note, she wrote as follows: "chart [medical doctor (M.D.) review (rev.)]." At the bottom of her note, she wrote the following: "IM [inmate] wants cane." Obaisi Affidavit, ¶15; Funk Affidavit, ¶47; Sick call request dated August 22, 2002.

50.     The Plaintiff admits that he has played the basketball game H-O-R-S-E while in prison. Deposition at 48, lines 14-16.

51.     The Plaintiff acknowledged that he may have played the basketball game H-O-R- S-E at Hill Correctional Center. Deposition at 49, lines 17-24.

52.     The Plaintiff's cane was metal, adjustable, and had 4 feet at the bottom. Deposition at 77, lines 1-17.

53.     The cane was originally taken by Captain Goodwin. Deposition at 76, lines 14-15.

54.     Initially, Dr. Obaisi gave the cane back to the Plaintiff, but then it was taken a way again for security reasons. Deposition at 76, lines 12-21.

55.     The Plaintiff recalls Dr. Obaisi telling him that, for security reasons, he could not have the cane. Deposition at 95, lines 18-19.

56.     In a prison setting, sometimes it is not the best thing to have a cane all the time, unless the individual really relies on the cane to walk. Deposition at 46, lines 11-14.

57.     On September 11, 2002, Dr. Obaisi noted in the medical records that the Plaintiff had been observed by security workers placing his cane in a locker which confirmed that the Plaintiff was able to work and ambulate (walk) without the need for a cane. Dr. Obaisi, therefore, discontinued (DC) the permit for the cane. Obaisi Affidavit, ¶16; Funk Affidavit, ¶48; Medical progress notes dated September 11, 2002.

58.     Later that day on September 11, 2002, a licensed practical nurse (LPN) wrote that the cane had been taken from the Plaintiff (inmate) per the doctor's (M.D.) orders. Obaisi Affidavit, ¶17; Funk Affidavit, ¶49; Medical progress notes dated September 11, 2002, 6:45 p.m.

59.     In Dr. Obaisi's opinion as a medical doctor, based upon both the subjective and objective of information gathered by medical staff concerning the underlying medical condition of Plaintiff's left hip, Plaintiff had no serious medical need for a cane while he was at Hill Correctional Center. Obaisi Affidavit, ¶6.

60.     When Goodwin took the cane, it was not being used. Deposition at 104, lines 3-14.

61.     Instead, the cane was in a closet in the dietary department. Deposition at 104, lines 3-14.

62.     The cane was in a closet where the Plaintiff had put it. Deposition at 104, lines 3-14.

63.     The Plaintiff has not had to have any sort of surgery on his left hip. Deposition and 44, lines 21-23.

64.     Nonetheless, the Plaintiff did not use a cane when he came for his deposition on January 30, 2008. Deposition at 44, line 24, through 45, line 10.

65.     The Plaintiff now has a cane again, but he left it in his cell on the date of his deposition. Deposition of 44, line 24, through 45, line 3.

66.     To get to his deposition, the Plaintiff walked two or three blocks and up the stairs without the assistance of a cane. Deposition at 103, lines 5-21.

67.     On another occasion when counsel for the Defendants came to take the Plaintiff's deposition he did not have his cane with him then either. Deposition at 46, lines 15-22.

68.     While at Dixon Correctional Center, the Plaintiff has coached football and softball. Deposition at 48, lines 7-10.

69.  The Plaintiff often does not use his cane. Deposition at 47, lines 4-5.

70.  The Plaintiff's pain was the worse on a scale of 1-10, being a 10 under Dr. Funk's care. Deposition, p. 70, lines 20-23.

71.  Plaintiff was provided Motrin for pain.  Deposition at 84, lines 17-21; Funk Affidavit, ¶ 33.

72.  Plaintiff was diagnosed with degenerative hip disease on June 4, 2001.  Funk's Affidavit ¶23; Radiological report dated June 7, 2001.

73.  Dr. Funk did not provide Plaintiff with either a job change, low bunk and Funk did not order a cane for Plaintiff.

74.  On June 20, 2002, Dr. Mesrobian ordered a low bunk for the Plaintiff.  However, this was after the Plaintiff left Pontiac Correctional Center where he was seen by Dr. Funk. Deposition at 14, lines 17-18.  Further, Plaintiff testified that his claim against Dr. Obasi does not concern a low bunk.  Deposition at 81, lines 14-16.

75.  Dr. Obaisi discontinued Plaintiff's cane use on September 11, 2002. Obaisi Affidavit, ¶¶ 6, 16; Funk Affidvavit, ¶ 48; Medical progress notes dated September 11, 2002.

Disputed Facts

1.  Dr. Funk denied job change and low bunk to relieve pain.  Funk's Affidavit, ¶ 32.

2.  A cane, therapy, medication and low bunk along with a back brace give the Plaintiff symptomatic relief[2].

The plaintiff offered a total of 21 additional undisputed material facts.  However, the court finds that fact 2 is conclusory; fact 7 and 16 are unsupported by evidentiary documentation; facts 8, 10-11, 13, 15 - 21 are immaterial as to Dr. Funk and Dr. Obasi;

Discussion and Conclusion of Law

Dr. Funk and Dr. Obaisi do not dispute that their actions were taken under color of state law.   The Plaintiff's action was brought pursuant to 42 U.S.C. §1983.  To state a claim under Section 1983, a plaintiff must allege a violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 49 (1988).   The United States Supreme Court has recognized that a contractual medical provider acts under color of state law when (1) performing an affirmative obligation of the State that (2) has been delegated to the contractual medical provider and (3) the contractual medical provider has voluntarily assumed that obligation by contract.  *West v. Atkins*, 487 U.S. 42, 56 (1988).  It is undisputed that Dr. Funk and Dr. Obaisi acted under color of state law when treating the Plaintiff's condition while working as a physicians treating patients within the Illinois Department of Corrections.

---

[2]This fact is vague as to the time frame.

Dr. Funks and Dr. Obaisi assert that the treatment prescribed was not cruel, was not unusual, and was not punishment.  The Plaintiff alleges that Dr. Funk and Dr. Obaisi violated his right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.  For purposes of determining tort liability under § 1983, "punishment" has both an objective and subjective component.  *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992).  The objective component is whether the acts or practices alleged to constitute cruel and unusual punishment are such as would be deemed cruel and unusual punishment if prescribed in a state or federal statute as the lawful punishment for a particular offense.  *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992).  The Supreme Court has also recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the 8th Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104, (1976).  Requiring an inmate to sleep in a top bunk if, in his treating physician's professional opinion, a low bunk was not medically required would not be deemed cruel and unusual punishment if prescribed in a state or federal statute as a lawful punishment for a particular offense.  Similarly, refusing to allow an inmate to possess a metal cane that might be misused as a weapon, and which was not being used for assistance with walking, would not be deemed cruel and unusual punishment if prescribed in a state or federal statute as a lawful punishment for a particular offense.  Based on the facts before this court, the court concludes that the Plaintiff had no serious medical need for different treatment and the requisite mental state for a claim of deliberate indifference is lacking.

Plaintiff's underlying condition of degenerative joint disease in his left hip was evaluated extensively and then treated with Motrin and free range of motion exercises.  In order to prevail on a claim of deliberate indifference, a Plaintiff must show that his condition was "objectively, sufficiently serious" and that the "prison officials acted with a sufficiently culpable state of mind."  *Greeno v. Daley*, 414 F. 3d 645, 652-653 (7th Cir. 2005).  With respect to the first requirement, a "serious medical need" is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person could easily recognize the necessity for medical treatment by a doctor.  *Foelker v. Outagamie County*, 394 F. 3d 510, 512-513 (7th Cir. 2005).  Depending upon its degree, degenerative joint disease might be a serious medical condition.  Nonetheless, these physicians were far from deliberately indifferent to Plaintiff's underlying condition of degenerative joint disease in his left hip.  While the Plaintiff was at Pontiac, his condition was evaluated by three doctors at the prison as well as a radiologist in Springfield.  After determining precisely what medical condition was causing the Plaintiff's symptoms, he was prescribed Motrin and free range of motion exercises.  When approximately one year later the Plaintiff was reevaluated by an orthopedic surgeon, he also prescribed Motrin and free range of motion exercises.  By the time Dr. Obaisi saw the Plaintiff at Hill Correctional Center, the Plaintiff's underlying medical condition of degenerative joint disease in the left hip had been evaluated extensively by numerous physicians, radiologists, and even an orthopedic surgeon.  Thus, the Plaintiff cannot simply point to his degenerative joint disease and claim deliberate indifference to that underlying medical condition.

It is also not sufficient for him to simply show that he might have received a different diagnosis or a different treatment.  "Medical malpractice in the form of an incorrect diagnosis or

improper treatment does not state an 8th Amendment claim." Gutierrez v. Peters, 111 F. 3d 1364, 1374 (7th Cir. 1997). In other words, medical malpractice does not become a constitutional violation merely because the victim is an inmate, and a complaint that a physician has been negligent in diagnosing or treating a medical condition of an inmate does not state a valid claim under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). As a result, courts must distinguish between (1) deliberate indifference to the serious medical needs of an inmate and (2) negligence in the diagnosis or treatment of the inmate's medical condition. *Gutierrez v. Peters*, 111 F. 3d 1364, 1374 (7th Cir. 1997). "Mere negligence or even gross negligence does not constitute deliberate indifference." *Snipes v. DeTella*, 95 F. 3d 586, 590 (7th Cir. 1996). These two physicians were not even close to deliberate indifference.

Plaintiff had no serious medical need for a low bunk and cane. Plaintiff claims that he had a serious medical need for a low bunk permit and cane, in addition to the Motrin and free range of motion exercises that he received. Nonetheless, the Constitution does not guarantee prisoners a specific medical treatment or complete freedom from symptoms after treatment. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)(noting that it would be nice if pain would immediately cease after appropriate medical attention, but life is not so accommodating and those with the best treatment can still experience pain). The Constitution protects prisoners from deliberate indifference to serious medical needs. *Id.* Disagreement with a doctor's deliberate decision to treat a medical need in a particular way is not a question of constitutional law. *Snipes v. DeTella*, 95 F3d 586, 591 (7th Cir. 1996).

The Plaintiff's claimed need for different treatment in the form of a low bunk and cane, is not an objectively serious medical need. When analyzing a claim of deliberate indifference to a medical need, the "need" to which "indifference" is claimed must be objectively serious, meaning one that (1) a doctor says is required, or (2) is so obvious that even someone who is not a doctor would recognize as required. *Foelker v. Outagenic County*, 394 F.3d 510, 512-513 (7th Cir. 2005). The Plaintiff has not met his burden of proof under either theory.

No doctor has stated that the Plaintiff required a cane or low bunk in addition to the Motrin and free range of motion exercises that he received in 2001 when he was at the Pontiac Correctional Center, a Level 1 maximum-security prison. It is irrelevant that, approximately a year later at a Level 3 medium-security prison, another physician recommended that the Plaintiff use a cane when walking, because, at that point, multiple x-rays had been taken showing mild but objectively observable physical changes in Plaintiff's condition. To determine that a cane or low bunk was medically required for a patient who (1) complained of left hip pain for more than three to four months prior to being seen by the doctor, localized right shoulder pain, localized lower back pain, and difficulty urinating; (2) was taking Hytrin for his prostate; (3) presented with the mechanical axis deviation of his lower limbs and gait within normal limits, his left hip joint intact and a full range of motion, no spinal or muscle tenderness observed to the back; (4) was able to bend over and touch his toes; (5) was educated on free range of motion exercises and provided with Motrin, 600 mg, to be taken three times a day; (6) had his left hip x-rayed anteroposterior and frog leg lateral, based upon which the radiologist found no evidence of

fracture or dislocation, but reported degenerative changes, including mild joint space narrowing and large osteophyte formation, especially at the infereomedial margin of the femoral head; (7) appeared to be in no distress upon follow-up examination by a physician after the initial treatment and was determined to have stable degenerative joint disease in his left hip, as was the case with the Plaintiff in 2001, is simply not within the realm of knowledge of the lay person.

Similarly, no doctor has stated that the Plaintiff required a cane after he was observed at Hill Correctional Center walking and playing basketball without it. To determine that a cane is required for a patient who, according to his medical records, (1) shows no spasm of the paravertebral muscle at the cervical, dorsal and lumbar regions; (2) has no tenderness on percussion along the cervical, dorsal, and lumbar spines, (3) has good flexion/extension, lateral flexion/rotation of the cervical and lumbar spines; (4) has no pain on flexion/extension, lateral flexion/rotation of the cervical and lumbar spines; has no swelling or tenderness on palpation of the left hip; (5) has good active motion of both knees, ankles, and toes; (6) has good quadriceps strength; (7) also has good strength in the muscles around both hips; (8) has x-rays demonstrating no osseous lesions about the innominate bone, the ischial tuberosities, or superior and inferior pubic ramus, an unremarkable right hip and right acetabulum, osteoarthritic changes with narrowing of the superior and lateral aspect of the left acetabular joint space, suspected early changes of developing subchondral geodes about the actabular component of the left hip, no other osseous lesions or evidence for intratrochanteric bursal calcification, moderate osteoarthritic changes of the left acetabular joint space with probable early subchondral geodes noted, and no evidence of avascular necrosis; (9) has been prescribed Motrin 600 mg three times a day, and was advised to do based upon which the radiologist found no evidence of fracture or dislocation, but reported degenerative changes, including mild joint space narrowing and large osteophyte formation, especially at the inferoemedial margin of the femoral head; (10) appeared to be in no distress upon follow-up examination by a physician after the initial treatment and was determined to have stable degenerative joint disease in his left hip, as was the case with the Plaintiff in 2001, is simply not within the realm of knowledge of the lay person.

Further, a layperson would not have reason to believe the Plaintiff needed a cane while at Pontiac or Hill Correctional Centers. At Pontiac, he worked as a porter, which required him to walk, carry, and lift. At Hill, he stored his cane in a locker while he worked in the dietary unit, which shows that he was able to work and walk without the need for a cane. Further, he was observed playing basketball without a shirt, sweating, and he walked well, ran and jumped.

There was no substantial risk of serious harm to the Plaintiff from the lack of a cane or low bunk, and his treating physicians quite reasonably inferred that there was no such risk. With respect to the second requirement, i.e., the culpable state of mind, the Plaintiff must demonstrate that Dr. Funk and Dr. Obaisi were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that they actually drew that inference. Greeno v. Daley, 414 F. 3d 645, 653 (7th Cir. 2005). The Plaintiff has not demonstrated this. First of all, the Plaintiff never asked Dr. Funk for a cane and it is undisputed that Dr. Funk did not believe a low bunk was medically warranted. Secondly, it would be absurd to find that a

substantial risk of serious harm existed to the Plaintiff as a result of Dr. Obaisi taking from the Plaintiff a cane that he was not using for assistance with walking anyway.  This is particularly true since the cane, which was not being used as intended, threatened the security of staff and inmates, including the Plaintiff himself, if it was misused as a weapon within the Level 2 security prison in which he was housed.  See the printouts from the Department's webpage regarding the security  classification levels of Pontiac (1), Hill (2), and Dixon (3) Correctional Centers, which are attached to defendants' summary judgment motion [215] as exhibits.

Finally, assuming arguendo that the treatment provided by his physicians was somehow insufficient as Plaintiff claims, "medical malpractice in the form of an incorrect diagnosis or improper treatment" does not state a claim under the United States Constitution." *See Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997).  The Plaintiff must establish that the decision to treat his degenerative joint disease with Motrin and free range of motion exercises instead of a low bunk and cane was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition" *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)) or was "equivalent of criminal recklessness" *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006)).  Proving deliberate indifference requires more than a showing of negligent or even grossly negligent behavior.  *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006).  Medical malpractice does not become a constitutional violation merely because the patient is in prison, and a complaint that a physician has been negligent in diagnosing or treating a medical condition of an inmate does not state a valid claim under the United States Constitution.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Finally, it appears that the Plaintiff is arguing that the Defendants delayed referring him to specialists for several months.  However, *See Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996), where the Court held "'An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed.'"  The Plaintiff has not placed any verifying medical evidence in the record that establishes any detrimental effect of delay.  Furthermore, this is not an issue that was remanded by the Seventh Circuit Court of Appeals in its May 29, 2007 mandate.

The court finds the Plaintiff had no serious medical need for a cane while he was housed at Pontiac Correctional Center and under Dr. Funk's care.  In fact he never asked Dr. Funk for a cane.  Plaintiff had no serious medical need for a cane when he was housed at Hill Correctional Center, when he was  under Dr. Obaisi's care. The Plaintiff had no serious medical need for a low bunk permit when he was at Pontiac Correctional Center either, and he is not claiming deliberate indifference to any such alleged need by Dr. Obaisi.  Second, neither physician had the requisite mental state for a claim of deliberate indifference.   Therefore, Dr. Funk and Dr. Obasis' summary judgment motion is granted [215].

Based on the foregoing it is ordered:

1.      IT IS THEREFORE ORDERED that the defendants' motion for summary judgment [215] is allowed.  The Clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56.  The case is terminated.  The parties are to bear their own costs.

2.      If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).

Enter this 30th day of March 2009.


**s\Harold A. Baker**


_____
Harold A. Baker
United States District Judge

14